IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Civil Action No. 11-cv-02838-CMA-BNB

ROSSI VENTURES, INC., and
MELINDA PASQUINI,

Plaintiffs,

v.

ANTONIO PASQUINI, and
PASQUINI FRANCHISING, LLC,

Defendants.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

I respectfully RECOMMEND that the **Motion for Preliminary Injunction** [Doc. # 14, filed 11/23/2011] by plaintiffs Rossi Ventures and Melinda Pasquini be GRANTED as specified, and that the defendants be preliminarily enjoined from use of the name "Pasquini's Pizzeria" or any variation thereof in connection with the operation of the restaurant located at 240 Milwaukee Street, Denver, Colorado.

### I.

The story of Denver's Pasquini family is compelling.

The matriarch of the family, Judy Pasquini, is the mother of the two principal parties. Antonio Pasquini ("Tony") is her son, and Melinda Pasquini ("Melinda") is her daughter. Mrs. Pasquini was divorced in 1986. Transcript of Proceedings, Vol. III [Doc. # 52] ("Trans. III") at p. 612. Her former husband returned to his native Italy after the divorce. Transcript of Proceedings, Vol. I [Doc. # 50] ("Trans. I") at p. 50. Mrs. Pasquini was awarded from the

marital estate a building located at 1310 Broadway in which was operated Pizza King, "a pizzeria going out of business." Trans. III [Doc. # 52] at p. 613. Pizza King was three months behind in its rent. Mrs. Pasquini testified that she went to Pizza King to collect the past due rent, and the pizza man "took off his apron, and he walked out and left me standing there." Trans. III [Doc. # 52] at p. 613. That is how Denver's Pasquini's Pizzeria was born.

Mrs. Pasquini gave the building and failing pizza business to Tony, id., who was a college senior studying marketing at the University of Colorado at Boulder. Transcript of Proceedings, Vol. II [Doc. # 51] ("Trans. II") at pp. 433-35. Tony obtained a loan of $300 from his uncle "and went and bought supplies and opened the door, and built the business." Id. at pp. 435-36.

Pasquini's Pizzeria on Broadway ("Pasquini's Broadway") was a family affair. Mrs. Pasquini, who was a school teacher, "would come down and help . . . after school when she could." Id. at p. 436. Melinda, who was 12, also was involved in running the restaurant. Trans. I [Doc. # 50] at pp. 50-55; Trans. II [Doc. # 52] at p. 437. Tony innovated and developed the Pasquini's concept:

> [W]e truly started out with nothing. There was a pizza oven, a mixer, an old little register and nine formica tables. . . .
>
> I went and got business cards made up that said, you know, come in for a free slice of pizza. . . . [T]he location is in Antique Row. I went up and down the street giving out cards for a free slice of pizza. I still remember my first customer George from Gates Rubber which was right down the street. He came in that first day. I think we made probably 20-to-$30 a day for that first six or eight months. . . .
>
> [O]kay, we had an extra $10. So what do you do? We had paper-- we were serving pizza on paper plates. What do you do to differentiate yourself?

2

\*   \*   \*

We had paper plates.  Everybody has paper plates.  So we went down to Goodwill, we bought plates, mismatched places for ten cents and we served our pizza on mismatched plates.

\*   \*   \*

So, we were in the middle of the antique district.  And I didn't have any money but I have pizza.  So I would trade pizza for, you know, old wood chairs.  And we would have all mismatched chairs that we would paint, and paint them all different colors.  And so we had different chairs.  One of our customers was a tile--a tile company.  And again, didn't have money.  We traded them--they order lunch, so I traded them pizza for tiles.  And we took the tables--we had a table making party.  And we got all my friends and we made tables.  And I bought them some beer and we made mosaic tables to make the place unique.

Paint.  I can't afford 40--at that time $25 for a gallon of paint.  Go to Home Depot, they still have those $5 mismatched, you know, colors.  Well, guess what, Pasquini's now has all different colors.  That's why.  Because we couldn't afford to buy eight gallons of the same paint.  Because--we'd go to Home Depot and paint this wall orange and this wall blue and this wall yellow.

\*   \*   \*

When you came into a Pasquini's, yes you got a slice of pizza, right?  That's great.  Fine and dandy.  But, you know, my mom through example, and, you know, I think I do a good example of following her lead now and over the years, is she accepted everyone.  It doesn't matter, . . . you're welcome at Pasquini's.  And that was the secret to our success.

It was--it just became a feeling.  When people came into Pasquini's it was like--it's this intangible, but you can--it's tangible because it's so real, that feeling of, hey, there's something special about this place.  There's all different kinds of people here.  You know, I'm welcome.  No one is judging me.  I can be myself.  I can have a good time.

\*   \*   \*

So, big thing of Pasquini's is, hey, kids get to make their own pizza.  They come in, we give them dough, we give them sauce.  They bring it to the table, they bake it all.  And guess what, you have a customer for life.

\*   \*   \*

So, it became clear that, you know, that we have something here.  And--and the experience is that Pasquini's has become a

3

> neighborhood place. . . .  Pasquini's meets the needs of the
> neighborhood.  It's--it's a good concept and its--and it's real.
>
>                    *  *  *
>
> And we mismatch and put all this stuff together and, guess what, it
> all matches.  And it's part of our concept.  It's--you take a 2-year-
> old, and 82-year-old, mismatched plates and mismatched
> everything, and you put them together, that's Pasquini's.  That's
> what--that's what we're about.

Trans. II at pp. 437-41, 500, 517-18.

Tony formed Pasquini's Pizzeria, Inc. ("PPI"), in 1986.  Mrs. Pasquini had no ownership interest in the business.  Trans. III [Doc. # 52] at p. 613.  Melinda acquired shares in PPI beginning in approximately 1991, Trans. II [Doc. # 51] at pp. 443-45, eventually owning more than 25% of the company.  Exh. P-5 at p. ROSSI  0264.

Tony opened a baking company, Pasquini's Baking, in December 1994 in a building a few doors down the street from Pasquini's Broadway.  Trans. II [Doc. # 51] at p. 446.  In July 1998, PPI entered into a License Agreement with Humboldt and Seventeenth, LLC, for the operation of a Pasquini's Pizzeria in the Uptown neighborhood ("Pasquini's Uptown").  Exh. P-50.  Tony and Melinda, as 50/50 partners, opened a Pasquini's Pizzeria in Louisville in 2001 ("Pasquini's Louisville").  Trans. II [Doc. # 51] at p. 461.

In 2004, Tony decided to get out of the pizza business.  Id.  Tony testified:

> I wanted to take advantage of what I built on Pasquini's on
> Broadway, and maybe, you know, use that to do--buy real estate
> and then--and then also maybe open restaurants down the road.
> But, you know, at the time it was a--kind of cash-out kind of
> opportunity.  Or not opportunity, but decision.

Id. at 462-63.

4

Although Tony was willing to sell to anyone, Melinda decided to keep the pizzeria in the family.  Because Melinda was a 50% owner of Pasquini's Louisville, "it was kind of a no-brainer that . . . [Tony] would find a way to make sure that I kept Louisville."  Trans. I [Doc. # 50] at p. 59.

Negotiations for Melinda's purchase of Pasquini's Broadway were more complex.  They began in 2003 and continued through the closing in October 2004.  Id. at pp. 60-61.  The negotiations are evidenced by emails, Exhibit D-1, and by at least three written agreements-- (1) the Purchase Agreement, dated 7/20/2004 (Exhibit 3); (2) the Agreement for Purchase and Sale, dated 9/13/2004 (Exhibit 4); and (3) the Asset Purchase and Sale Agreement, dated 9/28/2004 (Exhibit 5).  Although none of the writings contains the precise terms performed by Tony and Melinda in connection with the purchase and sale of Pasquini's Broadway, I find that the Asset Purchase and Sale Agreement dated 9/28/2004 (Exhibit 5) generally contains the agreement reached and performed by the parties.

Pursuant to the Asset Purchase and Sale Agreement, Melinda paid Tony and PPI $1,395,000, Trans. I [Doc. # 50] at p. 93, and received in return the "Business," defined as "an Italian style restaurant under the trade name of 'Pasquini's Pizzeria' located at 1308-1310 South Broadway," together with the inventory; all furniture, equipment, fixtures, and other tangible property owned by Tony and PPI "located in, on or about the Real Property"; all permits and licenses relating to the Business; the "associated goodwill (if any) and other intangibles related to the Business (the 'Goodwill')"; and the real property known as 1308-1310 South Broadway. Exhibit 5 at ROSSI  0347.  Significantly, Melinda also acquired:

> The use of the name(s) "Pasquini's Pizzeria" or any variation
> thereof.  Seller shall assign rights to the trade name to the Buyer.
> Seller agrees to cooperate with Buyer in enabling Buyer to use
> such name(s) in accordance with the requirements of Colorado
> law.

Id.  Finally, Tony acknowledged that as a part of the transaction Melinda acquired an exclusive

area for the operation of Pasquini's Broadway, Trans. II [Doc. # 51] at pp. 473-75, although the

northern boundary of the exclusive area is contested.

Melinda intended to buy Tony out of the pizza business altogether:

> By the time we got to closing on October 6th with Wells Fargo, by
> the time that 1.4 million was transferred to Tony there was no
> question that I was in charge of the restaurants.  I was moving
> forward and he was--he had retired.  And I was actually really
> proud of myself.  I thought, okay, I gave my brother a way to retire
> by the time he was 40.  I thought I did a good thing.  And I was
> also proud because everybody talks about family businesses and
> how things go bad, and I thought, I did it.  I got--I got it all
> separated.  We're good.  Now we can go forward and be a family.

Trans. I [Doc. # 50] at pp. 64-65, 89.

Tony closed Pasquini's Baking in the spring of 2005 and sold the equipment to Melinda.

Id. at 121.  Melinda moved the equipment to Pasquini's Louisville in the summer of 2005, and

operated a bakery to supply desserts and bread.  Id. at pp. 121-22.

Although the details are unclear, the parties do not dispute that as of approximately July

2006 Melinda had relinquished all of her stock in PPI, and Tony was the sole remaining

shareholder.  Exhibit D-6 at p. PFL000042.

Pasquini's Louisville closed in 2007, and Melinda moved the baking operation to

Pasquini's Broadway.  Id. at p. 122.  Melinda closed the bakery in July 2010.  Id. at p. 122.

Beginning in 2007, Tony through PPI entered into three franchise agreements for the

operation of Pasquini's Pizzerias.  The first was for a Pasquini's Pizzeria in the Highlands

neighborhood ("Pasquini's Highlands"), Exhibit D-8; the second for a Pasquini's Pizzeria in

Lone Tree ("Pasquini's Lone Tree"), Exhibit D-9; and the third for a Pasquini's Pizzeria in the

Denver Tech Center ("Pasquini's DTC").  Exhibit D-10.  Each of the franchise agreements

established an "exclusive area or territory" for the franchise.  See, e.g., Exhibit D-8 at p. 4.  In

addition, each franchise agreement contains PPI's warrantee that it "owns the exclusive right to

use the Names and Marks to establish Pasquini's Pizzeria restaurants in the United States and

Canada."  Id. at p. 24.

Melinda was aware that Tony was granting franchises for restaurants using the name

Pasquini's Pizzeria.  Trans. I [Doc. # 50] at pp. 135-36, 152, 154.  She assisted in training the

franchisees, id. at p. 154, and she attended the grand openings of the three new Pasquini's

restaurants.  Id. at pp. 201-02.  Although she now claims to own the Pasquini's Pizzeria

trademark, Melinda testified that she did not object to the franchises because:

> I owned the name, so I figured I can do what I want with it.  I can
> let my brother open a restaurant.  And I had always said, always, I
> would never get in the way of letting my brother open a restaurant
> **so long as he doesn't get in the way of me and my restaurants**. .
> . .
>
> And, in addition, we were--I was selling desserts to all the
> restaurants.  I mean, my brother is very good at marketing.  He's
> very good at expanding concepts.  He's very good at new ideas.
> And so I thought he--it was sold to me as:  Melinda, this is good
> for you.  Trust me.  I'm going to take charge.  I'm going to help us.
> It's going to be good for all of us.  You're going to sell desserts to
> all these restaurants and we're going to move forward, and you've
> got to trust me that this is going to be good for your restaurants,
> too.
>
> But, mind you, at that time it wasn't, hey, I'm going to franchise a
> bunch of restaurants.  That didn't happen until the end of 2009.

> That was just, hey, one time, Tony's opening a restaurant with
> somebody else.  He needs money.  He's going to run it.  He will
> make sure everybody is taken care of.  I'm going to sell more
> desserts.  That was my understanding of the situation.

Id. at pp. 135-36 (emphasis added).  Similarly, Tony testified:

> Before that it was, like, okay, go do what you want, Tony.  Open
> up other stores.  It's fine with me, I just don't--**just leave me alone
> for my store**.  Okay.  So that's exactly what I did for seven years.

Trans. II [Doc. # 51] at p. 507 (emphasis added).

And now the Pasquini's compelling story turns tragic.

The relationship between Tony and the Pasquini's DTC franchisee, Scott Holtzer, soured.

Mr. Holtzer objected to the requirement that he buy desserts from Pasquini's Broadway because

of the high prices charged.  Id. at pp. 394-95.  In response, Tony deleted the requirement and

"decided to go forward and have the franchisees order from an outside bakery."  Id. at p. 523.

In approximately July 2010, Melinda stopped making payments of approximately $7,000

per month to Tony on a promissory note.  Tony testified that the payments stopped in retaliation

for his decision not to buy desserts from Melinda's Pasquini's Broadway.  Id. at pp. 523-24.

Melinda contends that she stopped payments based on a subordination agreement with her

lender:

> I had been, I believed, overpaying on the note for years.  And I
> tried to get Tony to give me an accounting of how my payments
> were being applied, and there was a dispute between how much I
> had paid him and how much I had not paid him.  And there's a
> subordination agreement with Wells Fargo, and if I overpay Tony I
> would have been in violation of that subordination agreement.  So,
> I was trying to get Tony to give me an accounting.  And when he
> couldn't give me an accounting, and also when the desserts--he
> took the desserts away, I wasn't doing desserts anymore, and I
> didn't have money to keep overpaying. . . .

> I . . . went to Wells Fargo and got a loan to pay off the outstanding
> balance of what I owed Tony and--for them to release the
> subordination so that I could prepay him and pay him off and be
> done paying him.

Id. at pp. 662-63.  In any event, Melinda paid off the loan, in the amount of $129,377.84, on

approximately March 15, 2011.  Exhibit P-31.

In the fall of 2010, Tony approached Melinda and asked her to sign a license agreement

with PPI which would allow her to use the Pasquini Pizzeria name.  Trans. I [Doc. # 50] at p.

160.  According to Melinda, "I'm like what?  I should give you a license agreement was my first

thought."  Id.  Tony and Melinda met in August 2011.  According to Melinda:

> And in the process he said something about, I am so sorry, I did
> something really bad.  And he said, I assigned away your rights.
> And at the time we were talking about the desserts, we were
> talking about all the issues with the restaurant and I had no idea
> what he was talking about.  But now in retrospect I understand that
> he assigned my rights in the trade name to Pasquini Franchising
> without my consent or permission or knowledge.

Id. at p. 167.

Finally, the straw that broke the camel's back occurred when Tony announced in

September 2011that he planned to open a Pasquini's Pizzeria in the Cherry Creek neighborhood

at 240 Milwaukee Street ("Pasquini's Cherry Creek").  Trans. I [Doc. # 50] at pp.174-76.

According to Melinda:

> I couldn't even believe it.  So, on an emotional level I knew stuff
> was bad, but I didn't think it was that bad.  I thought he would at
> least discuss issues with me before moving forward.  But on a
> business level that was just--it was crushing.  I mean, instantly I
> started realizing that this--this is my location.  He's opening in my
> location.  Why--why would he open in my location?  How can it
> make sense?

Id. at p. 176.  Melinda retained counsel and directed them to send a cease and desist letter.  Id. at

p. 179; Exhibit 48.  The letter, dated October 17, 2011, demanded that Pasquini Franchising and Tony "cease and desist use of the Pasquini's names and service marks; in particular, use of the marks in all current restaurant operations and in connection with any further development or licensing of the same, without some further license or authorization from Melinda. . . ."  Exhibit 48 at p. 3.  When no resolution appeared likely, Melinda commenced this action on October 31, 2011.  Complaint [Doc. # 1].  Tony opened Pasquini's Cherry Creek on January 23, 2012.  Trans. II [Doc. # 51] at p. 516.

It is undisputed that the opening of Pasquini's Cherry Creek would violate PPI's license agreement with Pasquini's Uptown by interfering with Pasquini's Uptown's exclusive area.  Exhibit P-50 at p. ROSSI  0952.  That exclusive area is defined as Monaco at the East; 26th Avenue, 27th Street, Blake Street and Park Avenue at the North; 3rd Avenue at the South; and Speer Boulevard and I-25 on the West.  Id.  Consequently, prior to opening Pasquini's Cherry Creek, Tony negotiated a termination of Pasquini's Uptown's license.  Trans. III [Doc. # 52] at pp. 588-89, 593.

It is contested, however, whether the operation of Pasquini's Cherry Creek infringes on the exclusive area acquired by Melinda when she purchased Pasquini's Broadway from Tony and PPI.  I find that it does.

Tony claims that the exclusive area for Pasquini's Broadway extends only to 1st Avenue and that the operation of Pasquini's Cherry Creek north of 2nd Avenue is outside of that exclusive area.  The evidence establishes, and I find, that the exclusive area for Pasquini's Broadway extends north to 3rd Avenue.

My finding is based on the following.  First, the exclusive area granted by Tony through

10

PPI to Pasquini's Uptown in 1998, when Tony owned a majority interest in Pasquini's Broadway, extends south only to 3rd Avenue, not to 1st Avenue.  Exhibit P-50 at p. ROSSI 0952.  It makes no sense that the extremely valuable territory of North Cherry Creek between 1st and 3rd Avenues would be left as a "no man's land."  Second, an advertising flier sent out by Pasquini's Broadway in 2004 but prior to March 31, 2004, again at a time when Tony owned a majority interest in Pasquini's Broadway, contains a map of the Broadway store's delivery area which extends north to 3rd Avenue.  Exhibit P-39 at p. ROSSI  2151; Trans. III [Doc. # 52] at pp. 629-33.  Finally, Darren Carbary, one of the principals involved in the operation of Pasquini's Uptown, testified:

> Q      Did you have an understanding as to whose that territory was that was immediately south of your territory that ended at 3rd Avenue?
>
> A      Yes, it was definitely defined as South Broadway's territory.
>
> Q      And over the entire time that you were a licensee from 1998 through last month, did you ever hear Tony Pasquini ever object to, contest, in some way deny that the area south of 3rd Avenue was the South Broadway's exclusive territory?
>
> A      No, he never--yeah, he--he never--yeah, he never denied that that was their exclusive territory.

Trans. II [Doc. # 51] at p. 409.

II.

To obtain a preliminary injunction, the plaintiffs must show (1) a substantial likelihood of success on the merits; (2) irreparable harm if the injunction is denied; (3) the threatened injury outweighs the harm that the preliminary injunction may cause to the opposing party; and (4) the injunction will not adversely affect the public interest.  General Motors Corp. v. Urban Gorilla, LLC, 500 F.3d 1222, 1226 (10th Cir. 2007).  "In general, 'a preliminary injunction is an extraordinary remedy; it is the exception rather than the rule.'"  Id. (quoting O Centro Esperita Beneficente Uniao Do Vegetal v. Ashcroft, 389 F.3d 973, 976 (10th Cir. 2004)(en banc, per curiam)).

Three forms of preliminary injunctions are disfavored--(1) preliminary injunctions that disturb the status quo; (2) preliminary injunctions that are mandatory as opposed to prohibitory; and (3) preliminary injunctions that afford the movant substantially all the relief that may be recovered at the conclusion of a full trial on the merits--and must be "more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary."  O Centro, 389 F.3d at 975.  The moving party seeking a disfavored form of preliminary injunction must "make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms. . . ."  Id. at 976; accord General Motors, 500 F.3d at 1226.

A preliminary injunction that alters the status quo is disfavored because "it goes beyond the traditional purpose for preliminary injunctions, which is only to preserve the status quo until a trial on the merits may be had."  SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, (10th Cir. 1991), overruled on other grounds by O Centro Esperita Beneficente Uniao Do Vegetal v. Ashcroft, 389 F.3d 973, 976 (10th Cir. 2004)(en banc).  Mandatory injunctions are disfavored

because they are "more burdensome than prohibitory injunctions because they affirmatively require the nonmovant to act in a particular way, and as a result they place the issuing court in a position where it may have to provide ongoing supervision to assure that the nonmovant is abiding by the injunction." Id. Finally, a preliminary injunction which awards essentially full relief is disfavored because it is "similar to the 'Sentence first-Verdict Afterwards' type of procedure parodied in Alice in Wonderland, which is an anathema to our system of jurisprudence." Id.

III.

Contrary to the defendants' contention, Response [Doc. # 18] at pp. 7-8, the requested injunction does not disturb the status quo. "In determining the status quo for preliminary injunctions, [the] court looks to the reality of the existing status and relationship between the parties and not solely to the parties' legal rights." Schrier v. University of Colorado, 427 F.3d 1253, 1260 (10th Cir. 2005). The status quo has been described as "the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing" or the "last peaceable uncontested status existing between the parties before the dispute developed." Id. (internal quotations and citations omitted). In this case, the "last peaceable status" existing between the parties was prior to January 23, 2012, when Tony opened Pasquini's Cherry Creek. Consequently, I find that the requested preliminary injunction, seeking to preclude the defendants from operating a Pasquini's Pizzeria in the Cherry Creek neighborhood, would preserve and not disrupt the status quo.

Nor do I agree with the defendants that the requested injunction is a disfavored mandatory injunction. Response [Doc. # 18] at p. 8. An injunction is mandatory if it

13

"affirmatively require[s] the nonmovant to act in a particular way," thus requiring ongoing

supervision by the issuing court.  SCFC, 936 F.2d at 1099.  Here, to the contrary, the preliminary

injunction prohibits the defendants from using the Pasquini name in the operation of the Cherry

Creek pizzeria.  See American Academy of Husband-Coached Childbirth v. Thomas, 2010 WL

5184779, *1 (D. Colo. Dec. 15, 2010)(holding that an injunction that enjoins defendants from

using the plaintiff's trademark "is not a mandatory injunction").

IV.

The plaintiffs assert three claims for relief: (1) unfair competition in violation of Section

43(a) of the Lanham Act, 15 U.S.C. § 1125(a) and (b); (2) common law unfair competition and

trademark and tradename infringement; and (3) deceptive trade practices in violation of section

6-1-105, C.R.S.  Complaint [Doc. # 1].  They seek a preliminary injunction under their first and

second claims.

A.  Substantial Likelihood of Success on the Merits

Section 43(a) of the Lanham Act, prohibiting the use of false designations of origin,

protects against trademark and tradename infringement even if the mark is not federally

registered.  Donchez v. Coors Brewing Co., 392 F.3d 1211, 1215 (10th Cir. 2004).  To prevail in

an action for unfair competition under § 43(a), the plaintiffs must establish that (1) their mark is

protectable, and (2) the defendants' use of an identical or similar mark is likely to cause

confusion among consumers.  Id.

This case concerns the use of a surname--Pasquini.  The Tenth Circuit Court of Appeals

held in Marker Int'l v. DeBruler, 844 F.2d 763, 764 (10th Cir. 1988):

14

> Generally surnames are treated like descriptive marks in that secondary meaning must be shown for trademark protection under the Lanham Act.  A mark has acquired secondary meaning if because of association with a particular product or firm over a period of time it has come to stand in the minds of the public as a name or identification for that product or firm.  Whether or not a trademark has acquired secondary meaning is a question of fact.

(Internal quotations and citations omitted.)  Accord 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition §13:2 (4th ed. 2012)(stating that personal names "can be protected as trademarks only upon proof that through usage, they have acquired distinctiveness and secondary meaning").  Here, Tony's testimony concerning the Pasquini's concept, supra at pp. 2-4, clearly shows and constitutes an admission that the name "Pasquini's" has acquired secondary meaning and has "come to stand in the minds of the public as a name or identification for that product or firm."  Marker, 844 F.2d at 764.

Not only is the mark at issue a surname, but it is the surname of Tony Pasquini, one of the defendants.[1]  However, "the view that everyone has an 'absolute' or 'sacred right' to use one's own personal name as a mark has been uniformly rejected."  2 McCarthy at §13:8.  That is especially true here, where Tony and PPI sold to Melinda "[t]he use of the name(s) 'Pasquini Pizzeria' or any variation thereof . . ." and the "associated goodwill (if any). . . ."  Exhibit 5 at ROSSI 0347.  As the court held in Levitt Corp v. Levitt, 593 F.2d 463, 468 (2d Cir. 1979):

> If the infringing party has had some experience of his own in an industry, and wishes to establish a business under his own name, it is considered unfair to preclude him from using his name under all circumstances and for all times, although the first-comer has established a reputation and goodwill under the same appellation.

---

[1]See 2 McCarthy at §13:4 (noting that, as here, the "proliferation of competitive products or services sold under the same surname mark often occurs when members of a family business separate and start competing firms using the same surname as a mark").

15

> Where, as here, however, the infringing party has previously sold
> his business, including the use of his name and its goodwill, to the
> plaintiff, sweeping injunctive relief is more tolerable.

(Internal citations omitted.)  Accord 3 McCarthy at §18:32 (stating that "[w]hen a business and

good will are sold to another, the trademarks of the business pass, even though they may consist

of the personal name of the assignor.  If a person has sold a business which is identified by his

personal name, the name is an asset which he has sold, and he cannot keep commercial control of

the name and keep the purchase price too").

I find that the mark at issue--"Pasquini's Pizzeria"--has acquired a secondary meaning

and is protectable.

In addition, Tony and PPI are using an identical mark, and there is abundant evidence of

actual customer confusion.  Trans. I [Doc. # 50] at pp.182-87; Trans. II [Doc. # 51] at pp. 343,

346-49.

The defendants argue that the plaintiffs are not likely to succeed on the merits because

after the sale of Pasquini's Broadway to Melinda "Tony has exercised ownership and use of . . .

the Marks to openly conduct business on an ongoing basis, including the opening of new

Pasquini restaurants.  And Melinda was well-aware of this action."  Response [Doc. # 18] at p. 9.

In essence, the defendants argue that the plaintiffs acquiesced in the defendants' use of the name.

I do not agree that acquiescence bars the plaintiffs' requested relief.

It is not disputed that Melinda acquiesced in Tony's continued use of the Pasquini

Pizzeria mark in connection with the license he granted for Pasquini's Uptown and in connection

with the franchises for Pasquini's Highlands, Lone Tree, and DTC.  In particular, Melinda

testified that she "owned the name, so I figured I can do what I want with it.  I can let my brother

16

open a restaurant.  And I had always said, always, I would never get in the way of letting my

brother open a restaurant **so long as he doesn't get in the way of me and my restaurants**. . . ."

Trans. I [Doc. # 50] at pp. 135-36 (emphasis added).

Acquiescence by use may exceed the scope of the consent.  For example, in Operation

Able of Greater Boston v. National Able Network, Inc., 646 F. Supp. 2d 166, 173-74 (D. Mass.

2009), the district court granted an injunction notwithstanding prior acquiescence by the plaintiff

to the defendant's use of the mark, stating:

> [A]cquiescence does not extend to a use that has not yet
> materialized and is not foreseeable, and a defendant may exceed
> the scope of the plaintiff's consent and be exposed to liability for
> extra-consensual use.
>
>         *   *   *
>
> Prior to the time that plaintiff initiated this lawsuit, National Able
> did not provide direct services to participants under the SCSEP
> program in Massachusetts but, rather, provided those services
> through the Subgrant Agreement with plaintiff.  By expanding into
> a new market (i.e., offering direct services under the SCSEP
> program), National Able redirected its business so that it more
> squarely competed with plaintiff and thereby increased the
> likelihood of public confusion of the marks.
>
>         *   *   *
>
> Thus, the fact that plaintiff acquiesced in that use does not
> preclude it from challenging the defendant's expansion into an area
> that more squarely competes with its services.

(Internal quotations and citations omitted.)  Accord Conan Properties, Inc. v. Conans Pizza, Inc.,

752 F.2d 145, 153 (5th Cir. 1985)(holding that acquiescence will not bar an injunction against

infringement "when the asserted future infringement would occur in a geographical area other

than the one in which the plaintiff waived its right to protect its mark"); 6 McCarthy at §31:42

(noting that a defendant may exceed the scope of the plaintiff's acquiescence by moving into

direct competition with the plaintiff).

Tony and PPI sold to Melinda an exclusive area that extended north from Pasquini's Broadway to 3rd Avenue.  Prior to opening Pasquini's Cherry Creek, Tony had always respected and protected Melinda's exclusive area.[2]  Melinda acquiesced in Tony's use of the Pasquini Pizzeria mark in connection with stores distant from her exclusive area.  Tony exceeded the scope of Melinda's consent, however, when he opened Pasquini's Cherry Creek within her exclusive area.[3]

## B.  Irreparable Harm

Defendants' unauthorized use of the name Pasquini's Pizzeria in connection with its operation of Pasquini's Cherry Creek will result in irreparable injury to the plaintiffs including harm to the plaintiffs' reputation and compromise of the goodwill Melinda purchased from Tony and PPI in 2004 for more than $1.3 million.  The defendants' use of the name Pasquini's Pizzeria or any variation thereof in connection with Pasquini's Cherry Creek is likely to cause, and has caused, substantial consumer confusion.  Calculating the damages to the plaintiffs resulting from the defendants' infringement is difficult or impossible.  Absent entry of a preliminary injunction, the plaintiffs will incur, among other damages, lost business, lost business opportunities, lost

---

[2]In this regard, Tony's testimony is compelling:

> Before that it was, like, okay, go do what you want, Tony.  Open up other stores.  It's fine with me, I just don't--**just leave me alone for my store**.  Okay.  So that's exactly what I did for seven years.

Trans. II [Doc. # 51] at p. 507 (emphasis added).

[3]The fact that Pasquini's Cherry Creek is within Melinda's exclusive area is not determinative.  All of the other Pasquini's Pizzerias are distant from the border of Melinda's exclusive area.  Tony would have exceeded the scope of Melinda's consent, even if her exclusive area extended only to 1st Avenue, by opening Pasquini's Cherry Creek within a block-and-a-half of the boundary of her exclusive area.

reputation, employee attrition, and diminished employee morale.

### C. Balance of the Harms

The defendants will be harmed by the issuance of an injunction. However, they caused their own injury by opening Pasquini's Cherry Creek in violation of Melinda's exclusive area and in the face of the cease and desist letter sent by Melinda's lawyers in October 2011, three months before they opened the Cherry Creek restaurant. The defendants could have avoided any harm by opening under another name.

### D. Public Interest

The public interest will be served by avoiding consumer confusion if an injunction issues.

### E. Security

Rule 65(c), Fed. R. Civ. P., requires:

> The court may issue a preliminary injunction . . . only if the
> movant gives security in an amount that the court considers proper
> to pay the costs and damages sustained by any party found to have
> been wrongfully enjoined. . . .

A court enjoys "wide discretion" in determining whether to require security and in what amount. Winnebago Tribe of Nebraska v. Stovall, 341 F.3d 1202, 1206 (10th Cir. 2003).

The evidence concerning potential damages that may be sustained by an improper injunction is disputed. Tony testified at the preliminary injunction hearing that the cost to rebrand would be "in the hundreds of thousands of dollars for each restaurant." Trans. III [Doc. # 52] at p. 551. However, at a hearing where Tony was attempting to obtain an injunction against Pasquini's DTC from using the Pasquini's mark, Tony testified that the cost to rebrand would be less than $9,000. Trans. II [Doc. # 51] at pp. 398-99. In addition, the defendants were on notice by means of Melinda's cease and desist letter that the use of the Pasquini's mark in the

19

Cherry Creek neighborhood was not allowed, and they created the risk of injury by proceeding in the face of that letter.

Under these circumstances, a bond of $50,000 is appropriate.

V.

I respectfully RECOMMEND:

(1)     The Motion for Preliminary Injunction [Doc. # 14] be GRANTED as specified;

(2)     The defendants, their officers, agents, servants, employees, and all other persons in active concert or participation with them, be preliminarily enjoined from use of the name "Pasquini's Pizzeria" or any variation thereof in connection with the operation of the restaurant located at 240 Milwaukee Street, Denver, Colorado; and

(3)     The plaintiffs be required to post security in the amount of $50,000.

FURTHER, IT IS ORDERED that pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), the parties have 14 days after service of this recommendation to serve and file specific, written objections.   A party's failure to serve and file specific, written objections waives *de novo* review of the recommendation by the district judge, Fed. R. Civ. P. 72(b); Thomas v. Arn, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions. Makin v. Colorado Dept. of Corrections, 183 F.3d 1205, 1210 (10th Cir. 1999); Talley v. Hesse, 91 F.3d 1411, 1412-13 (10th Cir. 1996).   A party's objections to this recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review.   United States v. One Parcel of Real Property, 73 F.3d 1057, 1060 (10th Cir. 1996).

20

Dated April 9, 2012.

BY THE COURT:

 s/ Boyd N. Boland
United States Magistrate Judge